**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ARMANDO CARRASCO, individually, and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. |
| v. | **CLASS ACTION COMPLAINT**<br>Jury Trial Demanded |
| SOMNIA, INC., | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Armando Carrasco ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, "Class members"), by and through his undersigned attorneys, brings this Class Action Complaint against Defendant Somnia, Inc. ("Somnia"), and complains and alleges upon personal knowledge as to himself and information and belief as to all other matters.

## INTRODUCTION

1.      Plaintiff brings this class action against Somnia for its failure to secure and safeguard the personally identifiable information ("PII") and personal health information ("PHI") of approximately 428,853 individuals, including Plaintiff. The data reportedly exposed in the breach includes the most sensitive types of data that cybercriminals seek in order to commit fraud and identity theft. According to Somnia, information disclosed in the breach includes names, Social Security numbers, dates of birth, driver's license numbers, financial account information, health insurance policy numbers, Medical Record Numbers, Medicaid or Medicare IDs, and health information such as treatment and diagnosis info.

2.     Somnia is a healthcare company with its principal place of business in Harrison, New York. The company manages anesthesiologist companies throughout the country, including one that Plaintiff obtained services from.

3.     On or about July 11, 2022, Somnia determined that unauthorized individuals had gained access to its network systems and accessed the PII/PHI of Plaintiff and Class members (the "Data Breach").

4.     Somnia owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. Somnia breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect its patients' PII/PHI from unauthorized access and disclosure.

5.     As a result of Somnia's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of himself and all persons whose PII/PHI was exposed as a result of the Data Breach, which Somnia learned of on or about July 11, 2022, and first publicly acknowledged on or about September 23, 2022.

6.     Plaintiff, on behalf of himself and all other Class members, asserts claims for negligence, negligence per se, breach of fiduciary duty, breach of implied contract, and unjust enrichment, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

7.      Plaintiff Armando Carrasco is a Texas resident. Plaintiff Carrasco received a letter from Anesthesia Associates of El Paso PA (a company that Somnia manages) notifying him that his PII/PHI was among the information accessed by cybercriminals in the Data Breach. Had Plaintiff Carrasco known that Somnia would not adequately protect his and Class members' PII/PHI, he would not have received services from Somnia or any of its affiliates and would not have provided his PII/PHI to Somnia or any of its affiliates.

8.      Defendant Somnia, Inc. is a corporation formed in New York and has its principal place of business at 450 Mamaroneck Ave., Suite 201, Harrison, NY 10528.

## JURSDICTION AND VENUE

9.      The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

10.      This Court has personal jurisdiction over Somnia because Somnia was incorporated in New York and has its principal place of business in New York.

11.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Somnia's principal place of business is located in Westchester County, New York.

## FACTUAL ALLEGATIONS

### Overview of Somnia

12.      Somnia is a practice management company that focuses solely on anesthesiology

management.[1] The company provides services such as executive management, quality assurance, and payer contracting to the companies that it manages, among other services.[2]

13.     In the regular course of its business, Somnia collects and maintains the PII/PHI of patients, former patients, and other persons to whom it is currently providing or previously provided health-related or other services.

14.     Somnia requires patients to provide personal information before it provides them services. That information includes demographic information, health insurance information, and Social Security numbers.

15.     Plaintiff and Class members are, or were, patients of Somnia or received health-related or other services from Somnia, and entrusted Somnia with their PII/PHI.

### *The Data Breach*

16.     On or about July 11, 2022, Somnia discovered that unauthorized users had gained access to its network systems.

17.     On or about September 23, 2022, the individual anesthesiologist companies that Somnia manages began to report the Data Breach to the United States Department of Health and Human Services.[3] Somnia, Inc. separately reported a breach of its own records on October 24, 2022, claiming 1,326 persons were affected. The companies that Somnia controls and the number of persons that each company report as being affected by the Data Breach encompass at least the following:

- Anesthesia Associates of El Paso PA (43,168 affected)

---

[1] *About Us*, SOMNIA ANESTHESIA, https://somniaanesthesiaservices.com/somnia-anesthesia/ (last visited Nov. 4, 2022).
[2] *Id.*
[3] *See* Breach Portal, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited Nov. 4, 2022).

- Anesthesia Associates of Maryland LLC (12,403 affected)
- Anesthesia Services of San Joaquin PC (44,015 affected)
- Bronx Anesthesia Services PC (17,802 affected)
- Fredericksburg Anesthesia Services LLC (7,069 affected)
- Grayling Anesthesia Associates PC (15,378 affected)
- Hazleton Anesthesia Services PC (13,607 affected)
- Lynbrook Anesthesia Services PC (3,800 affected)
- Palm Springs Anesthesia Services PC (58,513 affected)
- Providence WA Anesthesia Services PC (98,643 affected)
- Resource Anesthesiology Associates of CA A Medical Corporation (16,001 affected)
- Resource Anesthesiology Associates of IL PC (18,321 affected)
- Resource Anesthesiology Associates PC (37,697 affected)
- Upstate Anesthesia Services PC (9,065 affected)
- Mid-Westchester Anesthesia Services PC (707 affected)
- Saddlebrook Anesthesia Services PC (8,861 affected)
- Resource Anesthesiology Associates of VA LLC (3,305 affected)
- Resource Anesthesiology Associates of CT PC (3,123 affected)
- Resource Anesthesiology Associates of KY PSC (8,995 affected)
- Resource Anesthesiology Associates of NM Inc (7,054 affected)

18.     Somnia, through its affiliates, has provided two different letters to state attorneys general for the Data Breach. In its report to the Maine Attorney General, Somnia includes both letters, one states that the information involved in the Data Breach includes an individual's "name, Social Security number, and some combination of the following data elements: date of birth, driver's license number, financial account information, health insurance policy number, Medical Record Number, Medicaid or Medicare ID, and health information such as treatment and diagnosis

info," and the other letter omits Social Security numbers.[4] However, Somnia's submission to the Vermont Attorney General includes only the letter omitting Social Security numbers from the affected information.[5]

### *Somnia Knew That Criminals Target PII/PHI*

19.    At all relevant times, Somnia knew, or should have known, its patients', Plaintiff's, and all other Class members' PII/PHI was a target for malicious actors. Despite such knowledge, Somnia failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from cyber-attacks that Somnia should have anticipated and guarded against.

20.    Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2022 report, the healthcare compliance company Protenus found that there were 905 medical data breaches in 2021 with over 50 million patient records exposed.[6] This is an increase from the 758 medical data breaches which exposed approximately 40 million records that Protenus compiled in 2020.[7]

21.    PII/PHI is a valuable property right.[8] The value of PII/PHI as a commodity is

---

[4] *See*, *e.g.*, https://apps.web.maine.gov/online/aeviewer/ME/40/e4ae5661-bf7b-4fe3-83e2-6395bc59043a/ca6dde6f-4d22-4407-a18a-392ef8a8dcdf/document.html (last visited Nov. 4, 2022).

[5] *See*, *e.g.*, https://ago.vermont.gov/blog/2022/10/24/resource-anesthesiology-associates-of-ct-data-breach-notice-to-consumers/ (last visited Nov. 4, 2022).

[6] PROTENUS, *2022 Breach Barometer*, PROTENUS.COM, https://www.protenus.com/breach-barometer-report (last visited Nov. 4, 2022).

[7] *Id.*

[8] *See* Marc van Lieshout, *The Value of Personal Data*, 457 IFIP ADVANCES IN INFORMATION AND COMMUNICATION TECHNOLOGY 26 (May 2015), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . . .").

measurable.[9] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[10] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[11] It is so valuable to identity thieves that once PII/PHI has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

22.    As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, Social Security numbers, PII/PHI, and other sensitive information directly on various Internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

23.    PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[12] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[13] A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident, and that a majority

---

[9] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192.

[10] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD 4 (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[11] *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERTISING BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[12] *See* Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH MAGAZINE (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[13] *Id.*

of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[14]

24.     All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security numbers, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[15] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[16]

25.     Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[17] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[18]

26.     Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies

---

[14] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010, 5:00 A.M.), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims.

[15] SC Staff, *Health insurance credentials fetch high prices in the online black market*, SC MAGAZINE (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[16] *See Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI CYBER DIVISION (Apr. 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[17] *See What Happens to Stolen Healthcare Data*, n.12, *supra*.

[18] *Id.*

confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[19]

27. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

### Theft of PII/PHI Has Grave and Lasting Consequences for Victims

28. Theft of PII/PHI is serious. The Federal Trade Commission ("FTC") warns consumers that identity thieves use PII/PHI to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[20]

29. Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[21] According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card

---

[19] Janice Y. Tsai, et al., *The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study*, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[20] *See What to Know About Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER ADVICE, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last visited Nov. 4, 2022).

[21] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official state or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

number to withdraw funds, obtain a new driver's license or ID, or use the victim's information in the event of arrest or court action.[22]

30.     With access to an individual's PII/PHI, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture, using the victim's name and Social Security number to obtain government benefits, or filing a fraudulent tax return using the victim's information. In addition, identity thieves may even give the victim's personal information to police during an arrest.[23]

31.     Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[24]

32.     Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of her Social Security number, and a new Social Security number will not be provided until after the harm has already been suffered by the victim.

33.     Due to the highly sensitive nature of Social Security numbers, theft of Social Security numbers in combination with other PII (e.g., name, address, date of birth) is akin to having

---

[22] *See* Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself?*, EXPERIAN (Sept. 1, 2017), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[23] *See Warning Signs of Identity Theft*, FEDERAL TRADE COMMISSION, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last visited Nov. 4, 2022).

[24] *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, Their Families, Friends And Workplaces*, IDENTITY THEFT RESOURCE CENTER, https://www.idtheftcenter.org/identity-theft-aftermath-study/ (last visited Nov. 4, 2022).

a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you haven't gotten a credit freeze yet, you're easy pickings."[25]

34.     Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[26] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[27] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care." [28] The FTC also warns, "If the thief's health information is mixed with yours, it could affect the medical care you're able to get or the health insurance benefits you're able to use. It could also hurt your credit."[29]

35.     A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

- Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

---

[25] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019, 3:39 P.M.), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

[26] Pam Dixon and John Emerson, *Report: The Geography of Medical Identity Theft*, WORLD PRIVACY FORUM 6 (Dec. 12, 2017), https://www.worldprivacyforum.org/2017/12/new-report-the-geography-of-medical-identity-theft/.

[27] *See Health Care Systems and Medical Devices at Risk…*, n.17, *supra*.

[28] *What to Know About Medical Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last visited Nov. 4, 2022).

[29] *Id*.

- Significant bills for medical goods and services not sought nor received.

- Issues with insurance, co-pays, and insurance caps.

- Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

- Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

- As a result of improper or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

- Phantom medical debt collection based on medical billing or other identity information.

- Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[30]

36.      There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used and it takes some individuals up to three years to learn that information.[31]

37.      It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black-market.

### *Damages Sustained by Plaintiff and the Other Class Members*

---

[30] *See The Geography of Medical Identity Theft*, n.26, *supra*.

[31] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 JOURNAL OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19 .pdf.

38.     Plaintiff and all other Class members have suffered injury and damages, including, but not limited to: (i) a substantially increased risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft and medical identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

## CLASS ALLEGATIONS

39.     This action is brought and may be properly maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

40.     Plaintiff brings this action on behalf of himself and all members of the following Class of similarly situated persons:

> All persons whose PII/PHI was accessed in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach.

41.     Excluded from the Class is Somnia, Inc. and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

42.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

43.     The members in the Class are so numerous that joinder of all Class members in a single proceeding would be impracticable. Somnia, through its affiliates reported to the United

States Department of Health and Human Services that the breach affected approximately 428,853 persons.

44.     Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

A.     Whether Somnia had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure;

B.     Whether Somnia failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII/PHI;

C.     Whether an implied contract existed between Class members and Somnia providing that Somnia would implement and maintain reasonable security measures to protect and secure Class members' PII/PHI from unauthorized access and disclosure;

D.     Whether Somnia breached its duties to protect Plaintiff's and Class members' PII/PHI; and

E.     Whether Plaintiff and all other members of the Class are entitled to damages and the measure of such damages and relief.

45.     Somnia engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff on behalf of himself and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

46.     Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had his PII/PHI compromised in the Data Breach. Plaintiff and Class

members were injured by the same wrongful acts, practices, and omissions committed by Somnia, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

47.    Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that Plaintiff has no interests adverse to, or that conflict with, the Class Plaintiff seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

48.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and all other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Somnia, so it would be impracticable for Class members to individually seek redress from Somnia's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## **CAUSES OF ACTION**

### **COUNT I**
### **NEGLIGENCE**

49.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

50.     Somnia owed a duty to Plaintiff and all other Class members to exercise reasonable care in safeguarding and protecting their PII/PHI in its possession, custody, or control.

51.     Somnia knew the risks of collecting and storing Plaintiff's and all other Class members' PII/PHI and the importance of maintaining secure systems. Somnia knew of the many data breaches that targeted companies that store PII/PHI in recent years.

52.     Given the nature of Somnia's business, the sensitivity and value of the PII/PHI it maintains, and the resources at its disposal, Somnia should have identified the vulnerabilities to their systems and prevented the Data Breach from occurring.

53.     Somnia breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it—including Plaintiff's and Class members' PII/PHI.

54.     It was reasonably foreseeable to Somnia that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

55.     But for Somnia's negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII/PHI would not have been compromised.

56.     As a result of Somnia's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other Class

members have suffered, and will continue to suffer, economic damages and other injury and actual

harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical

identity theft—risks justifying expenditures for protective and remedial services for which they

are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the

confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a

well-established national and international market; (v) lost time and money incurred to mitigate

and remediate the effects of the Data Breach, including the increased risks of medical identity theft

they face and will continue to face; and (vi) overpayment for the services that were received

without adequate data security..

**COUNT II**
**NEGLIGENCE PER SE**

57.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully

set forth herein.

58.     Somnia's duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for

Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164,

Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of

Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C

(collectively, "HIPAA Privacy and Security Rules").

59.     Somnia's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. §

45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted

by the FTC, the unfair act or practice by a business, such as Somnia, of failing to employ

reasonable measures to protect and secure PII/PHI.

60.     Somnia violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by

failing to use reasonable measures to protect Plaintiff's and all other Class members' PII/PHI and

not complying with applicable industry standards. Somnia's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains and stores, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

61.     Somnia's violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitutes negligence per se.

62.     Plaintiff and Class members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

63.     The harm occurring as a result of the Data Breach is the type of harm HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against.

64.     It was reasonably foreseeable to Somnia that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

65.     The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of Somnia's violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiff and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of

the value of their PII/PHI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

## COUNT III
## BREACH OF FIDUCIARY DUTY

66.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

67.     Plaintiff and Class members gave Somnia their PII/PHI in confidence, believing that Somnia would protect that information. Plaintiff and Class members would not have provided Somnia with this information had they known it would not be adequately protected. Somnia's acceptance and storage of Plaintiff's and Class members' PII/PHI created a fiduciary relationship between Somnia and Plaintiff and Class members. In light of this relationship, Somnia must act primarily for the benefit of its patients and former patients, which includes safeguarding and protecting Plaintiff's and Class Members' PII/PHI.

68.     Somnia has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of their relationship. It breached that duty by failing to properly protect the integrity of the system containing Plaintiff's and Class Members' PII/PHI, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiff's and Class members' PII/PHI that it collected.

69.     As a direct and proximate result of Somnia's breaches of its fiduciary duties, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and

recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Somnia's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT IV
## BREACH OF IMPLIED CONTRACT

70.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

71.     In connection with receiving medical services, Plaintiff and all other Class members entered into implied contracts with Somnia.

72.     Pursuant to these implied contracts, Plaintiff and Class members paid money to Somnia, whether directly or through their insurers, and provided Somnia with their PII/PHI. In exchange, Somnia agreed to, among other things, and Plaintiff understood that Somnia would: (1) provide medical services to Plaintiff and Class member; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII/PHI; and (3) protect Plaintiff's and Class members PII/PHI in compliance with federal and state laws and regulations and industry standards.

73.     The protection of PII/PHI was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and Somnia, on the other hand. Indeed, as set forth *supra*, Somnia recognized its duty to provide adequate data security and ensure the privacy of its patients' PII/PHI with its practice of providing patients with a privacy policy. Had Plaintiff and

Class members known that Somnia would not adequately protect its patients' and former patients' PII/PHI, they would not have received services from Somnia.

74.     Plaintiff and Class members performed their obligations under the implied contract when they provided Somnia with their PII/PHI and paid—directly or through their insurers—for health care or other services from Somnia.

75.     Somnia breached its obligations under its implied contracts with Plaintiff and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII/PHI and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

76.     Somnia's breach of its obligations of its implied contracts with Plaintiff and Class members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class members have suffered from the Data Breach.

77.     Plaintiff and all other Class members were damaged by Somnia's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) overpayment for the services that were received without adequate data security.

## COUNT V
## UNJUST ENRICHMENT

78.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

79.     This claim is pleaded in the alternative to the breach of implied contract claim.

80.     Plaintiff and Class members conferred a monetary benefit upon Somnia in the form of monies paid for health care or other services.

81.     Somnia accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class members. Somnia also benefitted from the receipt of Plaintiff's and Class members' PII/PHI, as this was used to facilitate payment.

82.     As a result of Somnia's conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiff and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

83.     Somnia should not be permitted to retain the money belonging to Plaintiff and Class members because Somnia failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

84.     Somnia should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in his favor and against Somnia as follows:

A.     Certifying the Class as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B.     Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.     Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of themselves and the Class, seek appropriate injunctive relief designed to prevent Somnia from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.     Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.     Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.     Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: November 8, 2022

Respectfully submitted,

*/s/ Todd S. Garber*

Todd S. Garber
Andrew C. White
**FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP**
One North Broadway, Suite 900
White Plains, NY 10601
Tel: 914-298-3284
Fax: 914-908-6722
tgarber@fbfglaw.com
awhite@fbfglaw.com

Ben Barnow*
Anthony L. Parkhill**
Riley W. Prince**
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Ste. 1630
Chicago, IL 60606
Telephone: (312) 621-2000
Facsimile: (312) 641-5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com
rprince@barnowlaw.com

*admission to be sought
***pro hac vice* to be submitted